John Yeaney, Walker Smith, John C. Smith and John F. Dinger *v.* Benjamin Keck, Executor of John Keck, deceased, Appellant.

[Marked to be reported.]

*Equity—Fraud—Tenants in common—Accounting.*

A person having an option to purchase land for $15,000 represented to certain others that the option was for $24,000, and at his request they joined him in the purchase, and the deed for the land was made to the person having the option and his associates as tenants in common. Each of the associates paid his share of the $24,000 to the owner of the option, but he paid to the vendor only $15,000. *Held*, that the owner of the option was liable to his associates for their respective proportions of the secret profits which he had made off them, and that a court of equity had the power to compel him to account to them.

Argued Oct. 15, 1897. Appeal, No. 144, Oct. T., 1897, by defendant, from decree of C. P. Jefferson Co., Sept. T., 1889, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account.

The case was referred to Charles Corbet, Esq., as master, who reported in favor of dismissing the bill.

Exceptions to the master's report were sustained in an opinion by CLARK, P. J., and a decree entered against the executor of John Keck for the amount claimed by the plaintiffs.

The facts appear by the opinion of the Supreme Court, but it will be noticed that the opinion says the deed was for 4040 acres, while Keck speaks of the tract as containing 4080 acres. Keck thought it contained 4080 acres but later discovered his mistake and the deed was made for 4040 acres.

*Error assigned* among others was the decree of the court.

*G. A. Jenks*, with him *Harry R. Wilson*, for appellant.—The fiduciary relation does not arise when the vendor at the time he made the purchase owed no duty to the vendee: McElhenny's App., 61 Pa. 188.

A court of equity has no jurisdiction in this case.

*C. Heydrick*, with him *C. Z. Gordon*, for appellees.—Equity had jurisdiction: Short v. Stevenson, 63 Pa. 95; Zahn v. McMillin, 179 Pa. 146; Katz v. Johnston, 178 Pa. 346; Evans v. Goodwin, 132 Pa. 136; Edgett v. Douglass, 144 Pa. 95; Fidelity Co. v. Weitzel, 152 Pa. 502; Harrington Bros. v. Florence Oil Co., 178 Pa. 444.

OPINION BY MR. JUSTICE GREEN, January 3, 1898:

It was proved by indisputable testimony, and not at all denied, that the actual selling price of the land by the owner was $12,000, and that John Keck deceased obtained from W. R. Brown & Co. who were the selling agents of the owners, an option to buy the land for $15,000. It is also an undisputed fact that the price named in the deed was $24,240, and that the deed was made directly by the owner, Henry S. Mitchell, and his wife, to the ultimate purchasers. The plaintiffs were four of these purchasers, to wit: John Yeaney, Walker Smith, John C. Smith and John F. Dinger. The conveyance was made to all the purchasers jointly, and it expressed the interest of each one thus: W. H. Gotwald, one eighth, John F. Dinger, one eighth, Walker Smith nine thirty-seconds, John C. Smith, three sixteenths, John Keck one eighth, John Yeaney, one eighth, Benjamin Keck one thirty-second. Under the deed the vendees took title to the whole property, 4040 acres, as tenants in common, and the fractional interests of each were in the whole property, and the relation of the parties to each other was that of tenants in common. The evidence also shows without dispute that John Keck was the one and only person who negotiated the sale. It was he, individually, who procured the purchasers. Whatever representations therefore he made to induce the purchasers to buy were made upon his personal responsibility. It is also an undoubted fact established by a mass of testimony which is not disputed, that John Keck did actually represent that the purchasing price which was to be paid for the land, was $6.00 per acre. It is desirable that some of the testimony should be quoted, in order to show just what was said, and by whom and to whom it was said, in relation to this subject. John Slicker testified that he had known John Keck about thirteen years; that he met him at church in the summer of 1888, and that Keck told him, "he had been to

Florida and looked at a piece of timber land, in which there was about four thousand acres.   He showed me a draft he had. He said this tract of timber land we can buy for $6.00 an acre which will make about $24,000.   Now, he says, this timber land is valuable property, and I would like to get enough partners to buy this whole tract of land.   He asked me to go in with him and take it, and asked if I could get anybody else that he could get in as a partner.   I said to him—I had been over to John Dinger's—that I had heard him (Dinger) say he wanted to go to Florida the coming fall to look at some timber land, and I said you go over and see him, he will likely go in. He then wanted me to go and see Dinger. . . . He said that he had Mr. John Yeaney that he thought would go in—Mr. Walker Smith.   He said he thought Mr. Ben. Keck would go in but he would rather not have him go in.   He told me he was taking an interest himself but did not say how much. . . . Mr. Keck told me to speak to Mr. Dinger and my father, and Mr. Dinger then came over to my place and I told Mr. Dinger what Mr. Keck had told me.   I told Mr. Dinger that I thought there was a bargain in this land by what Mr. Keck had told me. . . . I had no further conversation with him until after he came back from Florida.   When he came back he said, we have got everything fixed up, there is a good company that we can start into business at any time.   He stated that there was in it Mr. John F. Dinger, John Yeaney, Walker Smith, John C. Smith, Mr. Gotwald and number one, himself, and Mr. Ben. Keck. . . . He stated from whom they were buying the land, but I cannot recollect the names.   He said he and the parties named were going in as partners to buy that land.   He said the $6.00 an acre was the price they were to pay for the land to the party in Florida, and I heard the names of Mitchell and Brown & Co. mentioned."

If the foregoing testimony is believed, and we know of no reason why it should not be, it meets several points of contention which are supposed to affect adversely any right of recovery in this case.   It seems clearly that the scheme of Keck was a scheme for a joint, and not a several, purchase of the land. His whole plan contemplated a purchase by others joined with himself in one common enterprise.   The deed is quite conclusive proof in the same direction.   It is a matter of no conse-

quence whatever whether they were, or were not partners in the technical sense of that term. They were beyond all question associated together in one joint purchase of a large tract of land, to which each was to contribute a definite proportion of the purchase money. It was shown by other testimony that such contributions were actually made, and that all the money to pay for this land was paid over to Keck by his associates, and that he paid the seller the real amount of the actual purchase money and, presumably, kept the residue of what was apparently the total sum of the purchase money, himself. The testimony of Slicker also shows that Keck declared to Slicker that the purchase money of the land was $6.00 per acre, and that this would make about $24,000 in all. Now the witness testified that at the request of Keck he saw Dinger and told Dinger what Keck told him. Dinger is one of the plaintiffs, and this testimony brings Keck's representations directly to him through an authorized agent, and establishes Keck's responsibility to Dinger, both for the truth of what he said, and the character of the association as being a joint one. William II. Merket said he was present and heard the conversation between Slicker and Keck, and he corroborated Slicker's testimony. Among other things he said that Keck said, " he was trying now to get parties to take shares in with him to buy this land, as he thought there was big money in it. I asked him if he had any share in it. He said he was going to take some share in it. . . . He thought there would be no trouble in getting partners enough to take the other three quarters."

Hulett E. Smith, a son of Walker Smith, one of the plaintiffs, testified that he was present at the conversation between Keck and his father and John C. Smith, his uncle, another of the plaintiffs, in June, 1888. He said: " Mr. Keck, my father and uncle John talked the matter over in the presence of myself and my brother. Father said if we go in we will have to be very careful and see that the title is good. Mr. Keck produced some papers and explained how Mr. Mitchell came by the land. He said he was buying from Mr. Mitchell, Judge Mitchell, I believe he called him. He said the price was $6.00 per acre. That is, Mitchell's price was $6.00 per acre. Father said if we paid the cash couldn't we get it cheaper. Mr. Keck said no, that that was their price. Mitchell's price. . . . Mr.

Keck said he had seen Mr. Dinger and Mr. Yeaney. Father said to Mr. Keck if you will take the half we will take the other half rather than have so many partners in it. Mr. Keck said that Mr. Yeaney and Mr. Dinger had partly agreed to take an interest in it, but he couldn't tell until Mr. Dinger came from seeing his father-in-law. They agreed to send Mr. Keck down to make the purchase." It was shown by other testimony that Keck did go to Florida and complete the purchase, taking the deed in the name of all, receiving from his associates their several portions of the purchase money which he paid over to the vendor, Mitchell. As it seems to us this was a most complete case, not only of a joint association in the purchase, but of an agency on the part of Keck to make and complete the purchase for all the parties, and including the acquisition of the title by obtaining the deed for the premises. We do not understand that this testimony was at all impeached or contradicted. If believed, it imposed, in addition to the other features, a relation of trust and confidence on the part of Keck to his associates. The testimony thus far includes all the plaintiffs, and joins Keck to them all in a common venture, in a relation of principal and agent, and in a relation also of trust and confidence.

Elmer E. Smith, a brother of the last witness, fully corroborated his brother's testimony as to the conversation in the presence of both, with Walker Smith and John C. Smith. He said, that in a conversation about a week previously, to which also his brother testified, Keck said: "I have struck a nice thing in Florida; there is 4040 acres of land that can be bought for $6.00 per acre. I am around trying to get parties to go in along and buy it, as it is too big a thing for me myself, and would like to have your father take a share too, as it would be a nice thing for you boys. . . . I then asked him who this land could be bought from. He said Mitchell. Judge Mitchell he called him. He then spoke of Mr. Brown being Mitchell's agent. I said, are you getting it from Brown or from Mitchell? He said 'if I get up the company we will get it direct from Mitchell. There will be no trouble about the title.' Then I asked him if he didn't suppose it could be bought for less than $6.00 per acre, as it was a good deal of money. He said no, that it could not, and he had only to the first of July at that price." Referring to the second conversation when all were together, he tes-

tified that "he (Keck) said that Yeaney and Dinger were privileged to go in along, and spoke of paying Mitchell $6.00 per acre for the land. Afterward Keck said that Mr. Yeaney had an eighth in the land." He also testified that when Keck came back from Florida he "had a bill of the expenses and had what each one's share would be, separate. He says you (me) count it yourself and see that I made no mistake. While I was counting it then he counted it over. We reduced it to thirty-seconds. Father paid for nine thirty-seconds, John C. Smith's cost six thirty-seconds, Mr. John Yeaney's was four thirty-seconds, Mr. Benj. Keck's was one thirty-second, John Keck's was four thirty-seconds, Gotwald's four thirty-seconds and Dinger's four thirty-seconds." Here was an exact ascertainment in figures, by Keck himself, of the precise joint interest of each party in the association. There is no dispute as to this testimony, and it seems impossible, in view of it, to give any force to the contention on behalf of the appellant that there was no joint interest in the transaction. Mr. Keck dealt with the whole number as his associates in a common enterprise, and he received their several proportions of the purchase money, and also of the expense money, entirely in that capacity. Some of the parties consulted Mr. C. Z. Gordon, a member of the bar of Jefferson county, in relation to the transaction before it was consummated, and he testified as to what took place, John Keck being present. He said: "When the parties named came into my office Walker Smith began the conversation; Keck was present. Walker told me they were all going in together to buy a piece of land in Florida. I think the names of all the parties who now appear in the deed were mentioned; that is my recollection. He (Smith) spoke of the number of acres, the price was also mentioned at $6.00 per acre. He said that John Keck had been in Florida, and knew all about the land, and that he was going to negotiate the purchase and transact the business, I think he said, for us." The witness spoke somewhat reproachfully to Walker Smith for trusting a matter of such importance to John Keck without seeing the land, and he says, "At that Walker Smith and John C. Smith began to protest very strongly that they had the utmost confidence in John Keck's integrity, and said that they would as soon trust him as they would themselves, and spoke of being neighbors." The witness insisted that one of them at least

should go with Keck to Florida and see the land, and consult an attorney there as to the title. As a matter of fact Walker, Smith and Dinger did go to Florida with Keck, but as Keck was dead and the others could not testify, there is nothing in the testimony as to what happened there that affects the relations of the parties. Mr. Gordon was asked, "Did Mr. Keck say whether the Smiths were or were not buying the land from him? A. Mr. Keck said nothing about it, but Mr. Walker Smith said in the presence of Mr. Keck that they were all going in together to buy this tract of land from Brown or Mitchell I don't know which—it was certainly not from Keck—and Keck did not refute the statement." Other testimony was taken to show the payment by the plaintiffs of their several portions of the purchase money, the receipt of which was not at all disputed. In addition to the verbal testimony, there were given in evidence two written agreements, one between John Keck and John Yeaney, dated June 20, 1888, and the other between John Keck and John C. Smith, dated June 19, 1888. Yeaney's agreement, after reciting that Keck had the refusal of 4040 acres of land in Florida at $6.00 per acre, stipulated that Keck should have conveyed to Yeaney an undivided one eighth interest in the land, for which Yeaney agreed to pay at the rate of $6.00 per acre, $1,000 down and the rest at any time thereafter when Keck should notify him, by a draft on New York, to be sent to Keck in Florida; "said Keck not to pay until he.is satisfied the title to said land is good." The agreement with John C. Smith was to the same effect, except that the interest was to be the undivided three sixteenths of the land.

It will be seen that both these instruments recited the fact that the refusal price of the land was $6.00 per acre, and the amount to be paid by each party was fixed on the basis that that was the actual purchasing price to be paid. Neither of them was an agreement by Keck to sell as his own the respective interests of each, but that those interests respectively should be conveyed by the owner, Mitchell, to these gentlemen as purchasers, and this is what was actually done.

As we view the case then, the evidence establishes the facts that John Keck having an option to buy the land through Brown & Co., for $12,000, but for which he was to allow Brown & Co. $3,000, sought the plaintiffs and asked them to join him

in the purchase of the tract; that in order to induce them to join in the purchase, he represented to them that he could buy the land for $6.00 per acre, which would amount to $24,000; that this was the sum which would have to be paid to the owner, and that it could not be had for less; that he accepted an authority from them to go to Florida and purchase the land at that price for all the parties, and to close up the transaction by accepting a deed for the premises if he was satisfied that the title was good; that portions of the purchase money were paid in advance to him to be paid for the land, and that all the purchase money which was furnished by these plaintiffs was sent to him in Florida to be paid for the land, and that it was all furnished at the rate of $6.00 per acre for the entire tract; that a deed was made by the owner and his wife, and delivered to Keck, for the whole of the premises, which recited that the purchase money of the land was $24,240, which was $6.00 per acre for 4040 acres, and that this deed included all of the plaintiffs, Keck himself and several others, as grantees as tenants in common of different and expressed undivided fractional interests in the land. The testimony also shows, without any contradictory evidence, that the original and continued assertion by Keck that the purchase money price to be paid to the owner was $6.00 per acre was an unqualified falsehood, that no such price was to be paid to the owner, or to the owner and other parties; that his assertion that the land could not be bought for any less than $6.00 an acre was equally false, that in point of fact Keck never paid that price for the land, but only the original price of $12,000 to the owner and $3,000 to Brown & Co.; and that out of the money he received from his associates, the plaintiffs, he kept for himself all of the difference between the amount received by him from his associates and the amount he actually paid out; that John Keck was not only guilty of falsehood and false representations, by means of which he obtained the moneys that were paid him, but he was also false to his agency for his principals in making and completing the purchase, concealing from them the real amount which he paid, and was to pay, for the land, and false both in his relation of agent, and in his relation of trust and confidence, in keeping from those who were his associates in the purchase, and his principals in the final negotiations and in the execution and acceptance of

the deed, their money deposited with him for the specific purpose of paying for the land, in excess of the amount he actually did pay.

We have no doubt of the jurisdiction of equity in such a case. Here is a community of interest in a joint venture in which the defendant has in his possession money belonging to the plaintiffs which requires an accounting for its just determination. Here is fraud practiced upon the plaintiffs, by means of falsehood and false representations to induce them to join him in an enterprise common to all. Here is the violation of a trust and confidence reposed in him by the plaintiffs, and a breach of his duty as the agent of the plaintiffs, as his principals, in the purchase of a large and valuable tract held by them and him as tenants in common. All of these are heads of equity jurisdiction. So far as the right to relief is concerned in such circumstances, our own case of Short v. Stevens, 63 Pa. 95, furnishes an almost exact parallel. The syllabus of the case is, " Stevenson being in negotiation for oil land, proposed to form a company, represented that the land could be bought for $12,000, and induced Short to take and pay for a share in it at $1,000. Stevenson bought the land for $6,000, without disclosing to his associates the price which he gave. *Held*, that on these facts Short could recover his money back." WILLIAMS, J., delivering the opinion said : " He (defendant) was not the owner of the land, and he did not buy it for himself, but for himself and his associates, and good faith required that he should deal fairly with them, and charge them no more than the amount actually paid therefor. As was said by the present Chief Justice in the recent case of Simons v. Vulcan Oil Co., 61 Pa. 202, 'An agent cannot make profits out of his principal in the business of his agency, nor a partner out of his co-partner without his assent, nor an associate out of his co-associates, for whom he had undertaken to act. That this is the law authorities need not be required to prove. It is elementary.' The principle applies with all its force to the facts as proved in this case, and the evidence should have been submitted to the jury, with the instruction that if they found that the defendant purchased the land for himself and associates without disclosing the price paid therefor, and was guilty of concealment and misrepresentation as to the terms of the purchase, the plaintiff was entitled to

recover back the advance price which he paid the defendant for his share."

In the case of Katz v. Johnston, 178 Pa. 346, a bill in equity was sustained upon the following facts: plaintiff and defendant entered into an agreement in writing to buy land and divide it into building lots for sale at a profit. Plaintiff was to furnish all of the hand money to make the deferred payments, and was to be repaid out of the first sales, and after such repayment she was to receive two thirds of the profits. Defendant negotiated for the purchase of the property, and by a secret arrangement with the vendors received $500 out of the purchase money. Only a very small amount was realized from the sale of the lots, and plaintiff was obliged to pay the whole amount of the purchase money. In the meantime judgments had been entered against the defendant which he claimed were paid. On a bill in equity filed by the plaintiff against the defendant, the court decreed that the defendant should repay to the plaintiff the $500 which he had fraudulently obtained from the vendors, and that he should pay to her one half of the purchase money or, in lieu of such payments, should execute to her a quitclaim deed of his interest in the land, and have the judgments against him satisfied of record. Held, that the decree was proper and should be affirmed.

In the case of Zahn et al. v. McMillin et al., 179 Pa. 146, we held that if a party knows that another is relying upon his judgment and knowledge in contracting with him, although no confidential relation exists, and he does not state material facts within his knowledge, the contract will be avoided; for, knowingly to permit another to act as though the action was confidential, and yet not state material facts, is fraudulent. The case was a bill in equity to account, alleging fraud by the defendants in withholding certain facts from the plaintiffs with whom they were jointly interested in a certain transaction in which all were interested. Our Brother DEAN, delivering the opinion, reversing the court below for dismissing the bill, said, "It is not denied, nor could it be, in the face of the evidence, that by that contract J. M. shares in the fruits of the fraud to which E. A. was an active party, and for which he is answerable in an account. But did J. M. by his declarations and conduct aid his brother in procuring the fraudulent contract so as to ren-

der him accountable in equity to these plaintiffs? The learned
court below thinks not, because he was not one of the contribu-
tors to the first enterprise, and therefore must be treated as a
stranger dealing at arms' length with the copartners or cotenants
of his brother. This is a mistake, for that one fact warrants no
such conclusion. If he had been a member of the first associ-
ation, and had untruthfully represented a material fact to his
associates, to induce them to part with their interests, that
would have been conclusive against him because of the legal
presumption of a confidential relation; but if there was not pre-
sumptively a confidential relation, still, was there one in fact,
or such relation as warranted them in relying in the truthful-
ness of his statements? The principle controlling such a case,
and deducible from all the authorities, is well stated by 1 Perry
on Trusts, sec. 179: ' There are cases where a party must
not be silent upon a material fact within his knowledge, al-
though he stands in no relation of trust and confidence. . . .
If a party knows that another is relying upon his judgment and
knowledge in contracting with him, although no confidential
relation exists, and he does not state material facts within his
knowledge, the contract will be avoided; for knowingly to per-
mit another to act as though the action was confidential and yet
not state material facts, is fraudulent.' "

Upon all the evidence in the present case, and upon all the
principles both of law and equity, to which persons in the rela-
tions of these parties are subject, we are of opinion that the de-
fendant's intestate is liable to account to the plaintiffs and their
associates in this proceeding. The assignments of error are dis-
missed.

The decree of the court below is affirmed and appeal dismissed
at the cost of the appellant.